## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DENNIS HARRIS,                            )
                                          )
                    Plaintiff,            )          2:09-cv-1406
            v.                            )
                                          )
MICHAEL J. ASTRUE, COMMISSIONER           )
OF SOCIAL SECURITY,                       )
                                          )
                    Defendant.            )

## MEMORANDUM OPINION

**NORA BARRY FISCHER, District Judge**

## I.        INTRODUCTION

Plaintiff Dennis Harris ("Plaintiff") brings this action pursuant to 42 U.S.C. §405(g),

seeking judicial review of the final determination of the Commissioner of Social Security

("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB")

under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The parties have filed cross

motions for summary judgment pursuant to Federal Rule of Civil Procedure 56, and the record

has been developed at the administrative level. (Doc. Nos. 6, 8). For the following reasons, the

Court will reverse and remand the decision of the ALJ with the direction to award benefits

consistent with an onset date of July 9, 2004.

## II.       PROCEDURAL HISTORY

Plaintiff filed his application for DIB on June 1, 2005, alleging disability since July

9, 2004 due to torn quadriceps.[1] (R. 35-39, 47). Plaintiff's claim was denied at the initial level

on August 10, 2005. (R. 30-33). He requested a hearing before an Administrative Law Judge

_____

[1] Citations to Docket No. 4, the record, are hereinafter in the form: "(R. ___)."

("ALJ") on September 25, 2005. (R. 34). A hearing was held on March 15, 2007 before Administrative Law Judge ("ALJ") Douglas Cohen. (R. 273-89). Plaintiff, who was represented by counsel, and Fred Monaco, a vocational expert, testified. *Id*. On April 12, 2007, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Act. (R. 15-22). The Appeals Council subsequently denied Plaintiff's request for review, thereby making the decision of the Commissioner final in the case. (R. 5-7).

On May 16, 2008, Plaintiff filed a civil action seeking review of the ALJ's decision by this Court. (*Harris v. Astrue,* Civ. A. No. 08-cv-667). On December 22, 2008, the case was remanded to the Commissioner by this Court for a redetermination of Plaintiff's education level for the purposes of determining the application of Grid Rule 201.17. (R. 324-325). The opinion additionally found error with the ALJ's application of 20 C.F.R. § 404.1656(a) as it applied to Plaintiff's case; specifically finding that Plaintiff's prior work should have been treated as "unskilled." (*Id*. at 321-324). On April 20, 2007, Plaintiff filed a second application for DIB. (R. 329). On February 3, 2009, by Order of the Appeals Council, the claims were rendered "duplicate" and remanded to the ALJ for "proceedings consistent" with the opinion and order of this Court. *Id*.

In response to the order of the Appeals Council, ALJ David Kozma held a second hearing on June 24, 2009 at which Plaintiff, who was represented by counsel, and an impartial vocational expert, George J. Starosta, testified. (R. 481-487). In an opinion dated July 22, 2009, the ALJ again concluded that Plaintiff was not "disabled" within the meaning of the Act. (R. 293-302). Plaintiff responded by commencing the instant action against the Commissioner on October 20, 2009. (Doc. No. 1).

**III.     STANDARD OF REVIEW**

2

This Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). The Court may not undertake a de novo review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 522, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside, even if this court "would have decided the factual inquiry differently." *Haranft v. Apfel,* 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents [her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Sec'y of Health and Human Servs.,* 841 F.2d 57, 59 (3d Cir. 1988); 42 U.S.C. §423 (d)(1). A claimant is considered unable to engage in substantial gainful activity "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §423 (d)(2)(A).

An ALJ must do more than simply state factual conclusions to support his ultimate findings. *Baerga v. Richardson,* 500 F.2d 309, 312-13 (3d Cir. 1974). The ALJ must make specific findings of fact. *Stewart v. Secretary of HEW*, 714 F.2d 287, 290 (3d Cir. 1983). Moreover, the ALJ must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its rule making authority under 42 U.S.C. §405(a), has promulgated a five-step sequential evaluation process to determine whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520 (b), 416.920 (b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." [20 C.F.R.] §§ 404.1520(c), 415.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. [20 C.F.R.] §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. [20 C.F.R. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

4

*Barnhart v. Thomas*, 540 U.S. 20, 24-5, 124 S.Ct. 176, 157 L.Ed. 2d 333 (2003)(footnotes omitted).

If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given plaintiff's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Heckler v. Campbell*, 461 U.S. 458, 461, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983); *Stunkard*, 842 F.2d at 59; *Kangas*, 823 F.2d 775, 777 (3d Cir. 1987); *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

## IV.     FACTS

### A.     General Background

Plaintiff was born on January 6, 1960, making him forty-nine years of age at the time of the second ALJ's decision. (R. 20, 35, 185). A forty-nine year old is considered a "younger person" under 20 C.F.R. § 404.1563(c). Plaintiff has an eighth grade education. (R. 20, 52, 482). Plaintiff had previously been employed as a cement finisher from 1978 until the onset his the alleged disability. (R. 40). Plaintiff continues to aver July 9, 2004 as the onset of his disability. (R. 35).

### B.     Medical evidence submitted prior to initial ALJ opinion

On July 9, 2004, Plaintiff dropped some wood while at work, which caused him to lose his balance and fall. (R. 101). The wood hit Plaintiff and he tore both of his quadriceps tendons. (R. 101). On the same day as the incident, Plaintiff had x-rays taken of his knees in the emergency room and he was placed into the care of Dr. Michael Gaffney, an orthopedic surgeon. (R. 106-7). Dr. Gaffney performed a bilateral quadriceps tendon repair on July 10, 2004. (R. 104-5). After two months of treatment, Plaintiff was no longer using a wheelchair and

began outpatient physical therapy. (R. 139). On November 11, 2004, Plaintiff was no longer wearing leg braces on a daily basis and Dr. Gaffney suggested that he look into some sort of vocational training as he felt it unlikely Plaintiff would be able to return to his old job. (R. 137). Plaintiff continued to have knee pain throughout this period, while making slow progress with physical therapy. (R. 135-139).

On January 14, 2005, Dr. Gaffney noted that he would allow Plaintiff to return to work at a sedentary level. (R. 135). Dr. Gaffney also ordered an MRI of both of Plaintiff's knees. *Id*.  Upon review, Dr. Gaffney stated that he "did not see anything on the MRI that made [him] want to explore his quadriceps tendons."(R. 134). He  also noted that Plaintiff was having a problem that sounded like depression and referred him to a psychologist at St. Margaret's Hospital. *Id*. On February 25, 2005, Dr. Gaffney suggested that Plaintiff try a new physical therapist who would include electrical stimulation in Plaintiff's therapy. (R. 133). On his April 1, 2005 visit with Dr. Gaffney, Plaintiff reported he had some improvement and the doctor noted that he was progressing with his new physical therapist. (R. 132). On April 29, 2005, Dr. Gaffney reported that Plaintiff had been discharged from physical therapy and ordered a second MRI. (R. 131). The second MRI indicated progressive healing of the quadriceps tendon, no defect, and less edema present. (R. 130). On July 1, 2005, Gaffney reported that plaintiff was near maximum medical improvement, but continued to experience soreness and popping in his knees. (R. 129).

Due to his injury, Plaintiff also indicated that he was experiencing depression and he received outpatient psychiatric care at the Western Psychiatric facility. (R. 116). Plaintiff first sought treatment on April 19, 2005. (R. 123-127). During this visit, Plaintiff was diagnosed with an adjustment disorder with depressed mood and it was indicated that he had experienced

a single episode of major depression. (R. 126). At his second visit on May 17, 2005, Plaintiff indicated that he was "slightly depressed." (R. 119). At this visit, it was again reported that Plaintiff had an adjustment disorder with depressed mood. (R. 120). It was also reported that Plaintiff had a mood disorder due to a general medical condition with a major depressive-like episode. *Id.*

The state agency medical consultant, Mary Diane Zelenak, completed a physical residual functional capacity assessment on August 8, 2005. (R. 184-190). She determined that Plaintiff could occasionally lift and carry ten pounds and frequently lift and carry less than ten pounds. (R. 185). She also found that he could walk at least two hours in an eight-hour work day and could sit about six hours in an eight-hour work day. *Id.*

On September 23, 2005, Plaintiff was re-examined by Dr. Gaffney. (R. 268). Dr. Gaffney noted slow progress with Plaintiff's knees with continued intermittent brace use. *Id*. He further noted infrequent episodes of instability in Plaintiff's knees and pain when using the stairs. *Id*. Quadriceps strength was 4/5, but with continued atrophy. *Id.* Dr. Gaffney noted an increased risk of Plaintiff developing patellofemoral arthritis. *Id*. Plaintiff had a follow-up appointment with Dr. Gaffney on November 15, 2005. (R. 267). Plaintiff reported increased pain with stair use and tightness around his left knee. *Id*. On examination, tenderness was present on both knees. *Id*. Quadriceps strength was 4/5 but with significant atrophy bilaterally. *Id*. Dr. Gaffney recommended a decrease in the weight used in leg exercises and an increase in repetitions. *Id*. He continued to note intermittent brace use. *Id*.

On February 21, 2006, Dr. Gaffney composed a letter stating that Plaintiff was able to walk with soft knee braces, but continued to have pain in his knees with associated weakness. (R. 260). He noted marked atrophy in Plaintiff's quadriceps bilaterally. *Id*. Dr.

Gaffney reported that Plaintiff was limited primarily by weakness in his quadriceps muscles, but also by patellofemoral chondrosis[2], which developed as a result of the injury. *Id*. He opined that Plaintiff was unable to go up and down steps normally due to pain and was only able to stand and walk for two hours in an eight-hour period. *Id*. Dr. Gaffney concluded that Plaintiff would not improve significantly in the foreseeable future despite the use of aggressive physical therapy and home exercises. *Id*.

Plaintiff returned to Dr. Gaffney on August 25, 2006 with complaints of right knee locking and pain in both knees. (R. 266). On examination, Dr. Gaffney noted slightly decreased strength in both knees and tenderness of the patella bilaterally. *Id*. X-rays showed some mild patellofemoral arthritis and no other abnormalities. *Id*. Dr. Gaffney reported that Plaintiff's patellofemoral chondrosis was bothering him and recommended the resumption of quad exercises and knee braces when necessary. *Id*. On November 21, 2006, Plaintiff presented with pain in the anterior aspect of his left knee with occasional instability. (R. 265). Plaintiff reported that he had increased his usage of anti-inflammatories. *Id*. On examination, Plaintiff had tenderness over the knee and some crepitance with knee flexion. *Id*. Plaintiff was prescribed Voltaren[3] and a resumption of the quadriceps rehabilitation program was recommended. *Id*.

---

[2]
    Patellofemoral chondrosis is the formation of cartilaginous tissue in the patellofemoral region. *Dorland's Illustrated Medical Dictionary*, 359 (31st ed. 2007).

[3]
    Voltaren is a nonsteroidal anti-inflammatory drug used to stop the production of natural substances that cause pain and swelling. National Institutes of Health/U.S. National Library of Medicine, "Voltaren," *available at*: http://www.nlm.nih.gov/medlineplus/druginfo/meds/a606003.html (last visited May 18, 2010).

Plaintiff had a follow-up with Dr. Gaffney on February 23, 2007 and complained of pain in both knees and increased episodes of "popping." (R. 264). Dr. Gaffney noted continued atrophy in both quadriceps with tenderness in both the patellae. *Id*. Plaintiff requested another round of physical therapy and was given a prescription for patellar-centralizing knee braces. *Id*. He was continued on Voltaren and vocational training was recommended. *Id*. Plaintiff reported that he did not feel he could read well enough to learn a new trade. *Id*.

### C. Medical Evidence submitted prior to the second ALJ opinion.

On July 6, 2007, Plaintiff's records were reviewed by Dr. Manella Link, a psychiatrist, who opined that Plaintiff suffered from a depressive disorder, not otherwise specified with mild restrictions of daily living and no other limitations. (R. 446-458).

Plaintiff returned to Dr. Gaffney on May 16, 2008 due to pain in both knees and in his back. (R. 461). Dr. Gaffney noted that Plaintiff had been in physical therapy for his back pain and was still wearing his knee braces as necessary. *Id*. On examination, tenderness was present in both knees with continued atrophy in both of the quadriceps. *Id*. X-rays revealed patellofemoral joint space narrowing with no osteophytes and several calcifications in the quadriceps tendon. *Id*. Dr. Gaffney recommended further physical therapy for Plaintiff's quadriceps. *Id*.

On June 3, 2009, Plaintiff underwent a psychological evaluation with Dr. Frank Meacci, a psychiatrist. (R. 472-478). On examination, Dr. Meacci reported that Plaintiff had prominent symptoms of chronic depressive disorder including flat affect, excessive sleep disturbance, disruption of daily diet, significant weight gain, episodes of agitation and irritability, and suicidal ideation. Dr. Meacci also noted that Plaintiff had "significant deficits in reading and arithmetic." (R. 475). Plaintiff was given the Weschler Adult Intelligence Scale

Test and performed with an estimated verbal IQ of 76, a performance IQ of 79, and a full scale IQ of 76, indicating the borderline range of intelligence. *Id*. Dr. Meacci noted that Plaintiff was "able to complete only the basic items on most of the subtests presented to him." *Id*. Plaintiff was also given the Wide Range Achievement Test and tested in 1st (first) percentile for reading word recognition[4], pronunciation skills, and reading composite[5]. (R. 476). He tested in the - 1st (negative first) percentile in sentence reading comprehension[6], spelling, and math computational skills. *Id*. Grade equivalents for the testing were noted as between the first and the third grade levels. *Id*. On the Motor Bender Gestalt Test[7], Plaintiff exhibited "some evidence of minimal neurological involvement suggesting organicity." *Id*. He scored a fifteen

---

[4]

Word reading measures letter and word decoding through letter identification and word recognition. PAR, "Wide Range Achievement Test IV," *available at:* http://www4.parinc.com/Products/Product.aspx?ProductID=WRAT4 (last visited May 14, 2010).

[5]

The reading composite score combines the word reading and sentence comprehension scores. PAR, "Wide Range Achievement Test IV," *available at:* http://www4.parinc.com/Products/Product.aspx?ProductID=WRAT4 (last visited May 14, 2010).

[6]

Measures the individual's ability to gain meaning from words and to comprehend ideas and information contained in sentences. PAR, "Wide Range Achievement Test IV," *available at:* http://www4.parinc.com/Products/Product.aspx?ProductID=WRAT4 (last visited May 18, 2010).

[7]

The Bender Gestalt Test, or the Bender Visual Motor Gestalt Test, is a psychological assessment instrument used to evaluate visual-motor functioning and visual perception skills in both children and adults. Scores on the test are used to identify possible organic brain damage and the degree maturation of the nervous system. Encyclopedia of Mental Disorders, "Bender Gestalt Test," *available at:* http://www.minddisorders.com/A-Br/Bender-Gestalt-Test.html (last visited May 18, 2010).

on the Beck Depression Inventory[8], indicating severe symptoms of depression. *Id*. Dr. Meacci

concluded that the tests indicated the presence of a "chronic mentally disordered condition

further complicated by severe learning skill deficits to include both reading and math." (R.

477). He also noted a largely untreated chronic depressive condition. He opined that the

combination of these problems served to impair Plaintiff's ability to function in social and work

settings. *Id*. Dr. Meacci formally diagnosed a reading disorder, mathematics disorder, and major

depressive disorder, recurrent, severe without psychotic symptoms with a GAF of 45.[9]

### D.    Administrative Hearings

---

[8]

     The Beck Depression Inventory (BDI) is a series of questions developed to measure the intensity, severity, and depth of depression in patients with psychiatric diagnoses. Its long form is composed of 21 questions, each designed to assess a specific symptom common among people with depression. A shorter form is composed of seven questions and is designed for administration by primary care providers.  Encyclopedia of Mental Disorders, "Beck Depression Inventory," *available at:* http://www.minddisorders.com/A-Br/Beck-Depression-Inventory.html (last visited May 18, 2010).

[9]

     The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest.   A GAF score of between 41-50 denotes "serious symptoms." The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000).  An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation . . . .)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood; of 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., . . . suicidal preoccupation)" or "inability to function in almost all areas . . .;  of 20 "[s]ome danger of hurting self or others . . . or occasionally fails to maintain minimal personal hygiene . . . or gross impairment in communication . . . ." *Id.*

At the first hearing on March 15, 2007, Plaintiff appeared with the assistance of counsel, Robert Gillikin, Esq. (R. 275). Plaintiff testified that he completed the ninth grade; did not receive a GED; could not read most written materials or write, but could read street signs, make change, and sign his name. (R. 276-77). He testified that he had not received any vocational training, but had worked as a cement finisher. (R. 277). He had participated in a three-year apprenticeship program to learn cement finishing. (R. 284). Plaintiff testified that the pain in his knees was causing problems for him with regard to climbing steps, bending, and stooping. (278-9). He also testified that he had problems sleeping and had been taking Trazodone, but was only taking a small amount, occasionally by the time of the hearing. (R. 279-80). He further testified that he had not had psychiatric treatment since May 2005. (R. 281). Plaintiff was taking Voltaren for pain and stated that it would ease the pain, but there would be residual pain. (R. 281). Plaintiff testified that after sitting for a certain period of time, his knees would lock up. *Id.* He also stated that he could stand for about twenty minutes at a time. *Id.* He further testified that he was able to do little chores around the house such as washing dishes.(R. 282).

Following Plaintiff's testimony, the ALJ heard testimony from a vocational expert, Dr. Fred Monaco. (R. 284). The ALJ asked the vocational expert whether an individual needed to be able to read or write to be a cement finisher. The vocational expert testified that an individual need not be able to read or write, and that since the job was skilled there would be no transferable skills to the sedentary level. (R. 284). The ALJ then posed a hypothetical question to the vocational expert and asked what work such a person could perform. (R. 285). The ALJ described a person who could do no more than two hours of standing or walking in an eight-hour day; would require a sit/stand option; could not climb stairs, ropes, ladders, and scaffolds

but could occasionally climb ramps; could not balance, squat, crawl, or kneel; could do occasional crouching and stooping; could not operate foot controls with the lower extremities; could not participate in occupations that required reading beyond the remedial level and that require more than the ability to write more than an individual's name; and could participate in occupations that required the ability to read basic traffic control devices like stop signs. (R. 285).

The vocational expert testified that the hypothetical person could do the job of a bench assembler, a machine feeder or off-bearer, and hand-working occupations. (R. 286). The vocational expert further testified that these jobs exist in significant numbers in the national economy. *Id.* The vocational expert also testified that if the hypothetical individual could not crouch or stoop, his testimony would not change. (R. 286). Finally, the vocational expert testified that his testimony would not change if the hypothetical individual would be limited to simple, routine, repetitive tasks not performed in a fast-paced production environment, involving only simple work-related decisions, and relatively few workplace changes. *Id.*

At the second hearing on June 24, 2009, Plaintiff testified that he was sixteen years old and in eighth grade when he was asked to leave his private school. (R. 482). Plaintiff also indicated current difficulties sleeping and focusing. (R. 483). He stated that he could lift twenty pounds and stand for about two hours. (R. 484). The ALJ proposed a hypothetical at the light exertional level with a sit/stand option. *Id.* The vocational expert testified that the hypothetical person could do the job of a ticket taker, cashier, and stocker. (R. 486). The vocational expert further testified that these jobs exist in significant numbers in the national economy. *Id.*

## V.      DISCUSSION

The ALJ concluded, in both determinations, that Plaintiff was not disabled as defined by the Social Security Act. The ALJ reached this decision after applying the five step framework for analysis summarized in *Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003).

## A.     The Five Step Analysis

Two sets of findings are at issue in this case, from the first and second ALJ opinions, respectively. In the first opinion, under the first step, the ALJ determined that Plaintiff had not engaged in substantial gainful activity at any time relevant to his decision. (R. 17). At step two, the ALJ determined that Plaintiff suffered from severe impairments under the standards set forth in 20 C.F.R. § 404.1520 (c). *Id.* Specifically, the ALJ determined that Plaintiff suffered from status post bilateral knee tendon ruptures with surgical repair, an adjustment disorder, and depression. *Id.* In the third step, the ALJ determined that none of Plaintiff's medical impairments met or equaled any impairment listed in 20 C.F.R. Pt. Subpt. P, App. 1 (the "Listing of Impairments"). *Id.*

Next, the ALJ determined that Plaintiff's current residual functional capacity did not allow him to return to his past relevant work. (R. 20). Accordingly, at step four the ALJ made the following residual capacity assessment:

> [Plaintiff] has the residual functional capacity to perform sedentary work involving standing and walking for two hours, and sitting for six hours, and allowing the claimant to sit and stand at his discretion, and not involving climbing of stairs, ropes, ladders, and scaffolds; and not involving the operation of foot controls; and involving no more than occasional climbing of ramps; and no more than simple, routine, repetitive tasks, not performed in a fast-paced production environment, involving only simple, work-related decisions, and in general, relatively few workplace changes; and jobs which would not require the ability

> to read on more than a remedial level, e.g., the ability to read
> basic traffic control devices; or write more than his name.

(R. 18). The ALJ further found that Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that Plaintiff's statements concerning the intensity, duration and limiting effects of these symptoms were not entirely credible. (R. 19).

Finally, under step five, the ALJ determined that there were jobs existing in significant numbers in the national economy that Plaintiff could have performed. (R. 21). In making this determination, the ALJ used the assistance of the Medical-Vocational Guidelines (hereinafter, "Grids"), 20 C.F.R. Pt. 404, Subpt. P, App. 2. *Id.* The ALJ explained that if Plaintiff had the capacity to perform the full range of sedentary work, a finding of "not disabled" would be directed by Grid Rule 201.19. *Id.* However, the ALJ determined that Plaintiff's ability to do all or substantially all of the requirements of this level of work was impeded by additional limitations. *Id.* Therefore, the ALJ relied on the vocational expert who testified that an individual with Plaintiff's limitations would be able to perform the requirements of the representative occupations of bench assembler, machine feeder/off-bearer, and a hand-worker. *Id.* He further determined that pursuant to SSR 00-4p, the vocational expert's testimony was consistent with the Dictionary of Occupational Titles. *Id.* Accordingly, the ALJ found that a finding of "not disabled" was appropriate under the framework of the rule. *Id.* As noted in the Court's prior decision, the ALJ considered Grid Rule 201.17 but found it inapplicable since the vocational expert testified that Plaintiff's past work was a skilled position. *Id.* at 21, n.1. The vocational expert testified as such despite the fact that Plaintiff did

not have the ability to read more than remedial traffic control devices or write more than his name. *Id.*

In the second opinion, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since July 9, 2004, the alleged onset date. (R. 295). At step two, the ALJ made a determination that Plaintiff suffered from the following severe impairments under the standards set forth in 20 C.F.R. § 405.1520 (c): status post bilateral knee quadriceps tear with surgical repair, borderline intellectual functioning, reading and mathematics disorders, major depressive disorder and adjustment disorder. *Id*. In the third step, the ALJ determined that none of Plaintiff's medical impairments met or equaled any impairment listed in 20 C.F.R. Pt. Subpt. P, App. 1 (the "Listing of Impairments"). (R. 21).

The ALJ then determined that Plaintiff's current residual functional capacity did not allow him to return to his past relevant work. (R. 300). The new residual functional capacity assessed by the ALJ stated as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform unskilled light work as defined in 20 CFR 404.1567(b) except claimant requires the option to sit and stand at his discretion.

(R. 297). Under step five, the ALJ determined that there were jobs existing in significant numbers in the national economy that Plaintiff could have performed. (R. 300). In making this determination, the ALJ concluded that Plaintiff had a limited education and was able to communicate in English and that transferability of jobs skills was not material because the Medical-Vocational Rules supported a finding that Plaintiff was "not disabled." (R. 300). As a result, the second ALJ determined that a finding of "not disabled" was appropriate under the Social Security Act. (R. 301).

### B.    Issues Before This Court

Plaintiff makes several arguments suggesting that the ALJ erred in his decision-making on remand from this Court. First, Plaintiff argues that the ALJ erred in disregarding the boundaries of the December 22, 2008 memorandum opinion and order of this Court. (Pl.'s Brief at 8-11). In conjunction with this argument, he contends that the ALJ again made a finding that Plaintiff's education was "limited or less" but then referred to his illiteracy. *Id.* at 11. In addition, Plaintiff argues that the ALJ erred in making a new residual functional capacity determination at a higher exertional level. *Id.* at 11. In an unrelated argument, Plaintiff discusses his age at the time of the second hearing (forty-nine and a half years old) and suggests that the second opinion failed to acknowledge a "borderline" age situation and appropriately apply the grid rules. *Id.* at 21-25. To the contrary, the Defendant argues that the ALJ's determination was supported by substantial evidence. (Def.'s Brief at 10-15).

### C.    Administrative *Res Judicata* and the initial ALJ opinion and findings.

Plaintiff's previous action in this Court resulted in a remand of this case to the Commissioner for further proceedings to be consistent with the December 22, 2008 memorandum opinion and order. In that decision, this Court determined that the ALJ erred in his interpretation of the regulations and should have treated Plaintiff's prior work as "unskilled." (R. 324). Error was also found with the ALJ's determination that Plaintiff was both "functionally illiterate" and had "limited or less" education. (R. 325). Both of these errors implicate the application of Grid Rule 201.17 to Plaintiff's case. (R. 322). A remand was ordered for the limited purpose of determining into which educational category Plaintiff should be placed. (R. 325).

It is apparent that on remand, the ALJ ignored both the order of this Court and the order of the Appeals Council instructing the ALJ to conduct "proceedings consistent" with the memorandum opinion and order of this Court. (R. 329). Rather than make a new finding regarding Plaintiff's educational level, the ALJ increased the exertional level of the residual functional capacity finding at step five and made several other findings that circumvented the need to apply Grid Rule 201.17 (the Court hereby incorporates by reference the discussion of the requirements of Grid Rule 201.17 at R. 321-325).

Considering the evidence outlining Plaintiff's physical and mental difficulties, it is unlikely that the second ALJ's conclusion that Plaintiff could perform work at the light exertional level with no non-exertional limitations could be upheld under the "substantial evidence" standard for the period prior to April 12, 2007, the date of the initial ALJ decision. The Court, however, need not directly address that question because the ALJ's reconsideration of this issue for the period covered by the initial ALJ decision was clearly impermissible. The relevant portion of 42 U.S.C. § 405(h) provides:

> The findings and decisions of the Commissioner of Social
> Security after a hearing shall be binding upon all individuals who
> were parties to such a hearing. No findings of fact or decision of
> the Commissioner of Social Security shall be reviewed by any
> person, tribunal, or governmental agency except as herein
> provided.

42 U.S.C. § 405(h). By its terms, §405(h) "gives finality to *findings*, as well as decisions, made in previous proceedings between the parties." *Lively v. Secretary of Health & Human Services*, 820 F.2d 1391, 1392 (4th Cir. 1987)(emphasis in original). Although the Court's remand order clearly contemplated a reexamination of Plaintiff's educational level, it did not give the ALJ a license to reconsider the prior determination outlining Plaintiff's residual functional capacity

18

for the aforementioned period. (R. 309-326). The reconsideration of the education level was not a situation in which the ALJ was dealing with a different period of time than the one at issue during the previous proceedings. *Rucker v. Chater*, 92 F.3d 492, 495 (7th Cir. 1996). Instead, the ALJ's subsequent determination that Plaintiff was capable of "light work" concerns the same time period for which it had previously been found that he was capable of "sedentary work" with significant nonexertional limitations. Under these circumstances, §405(h) precluded the ALJ from adjudicating a new residual functional capacity for the period prior to April 12, 2007. *Dennard v. Secretary of Health & Human Services,* 907 F.2d 598, 599-600 (6th Cir. 1990). Consequently, these findings were erroneous as a matter of law.[10]

### D.    Literacy Determination

As to the issue that precipitated the remand to the ALJ, the matter of Plaintiff's literacy, the second decision failed to follow the law as delineated in the December 22, 2008 opinion. In the initial ALJ decision, Plaintiff was referred to as both "functionally illiterate" and as having a "limited education." (R. 20). In the December 22, 2008 decision, this Court stated that "Plaintiff could not be both illiterate and have an education of 'limited or less'" for the purposes of Grid Rule 201.17. (R. 325). Remand was ordered for the purposes of determining one category into which Plaintiff should be placed. *Id*.

It is evident that new evidence regarding Plaintiff's ability to read and write was submitted upon remand and was noted by the ALJ. Despite this new evidence and a clear order on remand, the second ALJ stated as follows:

---

[10]    See the similar discussion of §405(h) in *Fligge v. Astrue,* Civ.A.No. 08-800, 2009 WL 904702 at * 14 (W.D.Pa. April 1, 2008)( the subsequent opinion of the ALJ revisited the severe impairment finding of the first opinion, altering that finding. The Court determined that the initial step two finding was binding under §405(h)).

> Intellectually, the claimant has been diagnosed with borderline intellectual functioning. He has reading and math deficits. However, he appears capable of making change, handling simple mathematics, signing his name, and reading basic traffic signs. In fact, despite of claims of illiteracy, the undersigned notes that he managed to obtain and hold a valid driver's license. Aside from the claimant's illiteracy, there is no indication that he has displayed signs of serious mental retardation which would further impact on his ability to perform work activity. To the contrary, the claimant was able to obtain and successfully perform a skilled position for many years. The undersigned's assessment of the claimant's residual functional capacity takes into account any shortcomings associated with his intellectual functioning.

(R. 296-297). This discussion does not differ significantly from that of the first ALJ decision (*see* R. 20), and again despite this finding of illiteracy, the ALJ also determined that Plaintiff's education was "limited or less." (R. 300).[11]

This analysis is obviously not what the Court envisioned when it remanded Plaintiff's case to the Commissioner with the admonition that Plaintiff's work history was "unskilled" and that the ALJ must "make a determination of the [educational] category into which Plaintiff should be placed." (R. 324-325). It is evident that the ALJ is placing Plaintiff in an educational category based on his numerical grade level, but also acknowledging illiteracy. As discussed in the Court's prior memorandum opinion, in determining an individual's education, the following mutually exclusive categories are used: 1) illiteracy, 2) marginal education, 3) limited education, and 4) high school education and above. 20 C.F.R. § 404.1564. "Illiteracy" is defined as "the inability to read or write." 20 C.F.R. § 404.1564(b)(1). "Limited Education" is defined as "ability in reasoning, arithmetic, and language skills, but not enough to

---

[11] The ALJ also erred in continuing to refer to Plaintiff's past work as skilled when this Court's prior memorandum opinion notably found that the ALJ had erred in treating Plaintiff's past work as skilled. (R. 322-324).

allow a person with these educational qualifications to do most of the more complex duties needed in skilled or semi-skilled jobs. Generally, a limited education is a 7th grade through 11th grade level of education." 20 C.F.R. § 404.1564 (b)(3).

For the higher levels of education, the regulations require some ability in reasoning and arithmetic. Section 404.1564 (a), however, directs that the numerical grade that a person has reached is not always representative of actual ability; it may be higher or lower based upon the time since education, past work experience, real life responsibilities, and the ability to communicate in English. 20 C.F.R. § 404.1564(a), (b). Most importantly, the SSA's policy is that illiteracy means the inability to read or write in the English language. Therefore, to make a factual determination of literacy, the ALJ must first examine the extent of formal education received, and then look for other evidence which would contradict any presumption of literacy which formal education creates.

In applying the literacy standard, many courts have veered from a mechanical application of the level of formal schooling to account for "functional illiteracy." *See Conn. v. Secretary of Health and Human Services*, 51 F.3d 607,609 (6th Cir. 1995) (finding a man with sixth grade education nevertheless functionally illiterate): *Skinner v. Secretary of Health and Human Services*, 902 F.2d 447, 449 (6th Cir. 1990)(holding that the inability to read more than a simple sign or to write on more than a third grade level is functional illiteracy); *Dollar v. Bowen*, 821 F.2d 530, 535 (10th Cir. 1987)(holding that mechanical application of the grids was in error when a man who finished 8 years of formal schooling was revealed by the evidence to be functionally illiterate); *Dixon v. Heckler*, 811 F.2d 506, 509-510 (10th Cir. 1987) (holding that where claimant completed 6 grades of school but testified that he could only read a little and "can't write," there was not substantial evidence of literacy; rather because literacy turns on

the ability to write as well as read, the inability to do either results in functional illiteracy). As exhibited by these cases, in instances where the evidence reveals significant inability in reading or writing in English, the amount of formal schooling is not substantial evidence of a particular education level.

In the instant case, the ALJ acknowledged Plaintiff's testimony that he could not read most written materials or write, could make change, could read street signs, and could sign his name. The ALJ essentially utilized this evidence, along with Plaintiff's testimony that he had completed eight grades of education, to suggest that Plaintiff could "perform work activity" despite being illiterate. (R. 296-297). The ability to make change, read a street sign, and sign his name is not substantial evidence to support a finding of "limited or less" education. Plaintiff's test results from Dr. Meacci indicated that he tested between the first and third grade levels. (R. 476). This placed him in the negative first percentile to first percentile of testing. *Id*. Dr. Meacci noted "significant deficits in reading and arithmetic" and the ability "to complete only the basic items on most of the subtests presented to him." *Id*. He was diagnosed with "severe learning skill deficits to include both reading and math." (R. 477). These diagnoses were noted by the second ALJ and he acknowledged "claimant's illiteracy." (R. 296-297).

Given both the previous ALJ's opinions discussing Plaintiff's "functional illiteracy" or "illiteracy," as well as an obvious misapplication of the regulations regarding the application of two educational categories, the Court does not find it prudent to waste further judicial and administrative resources in remanding this case for a second time. It is apparent that the ALJs were of the opinion that Plaintiff could be of both "limited education" and "illiterate." It has been made clear, now for the second time, that this is not the case. The second ALJ's notation that Plaintiff is illiterate is supported by substantial evidence, while his determination that

22

Plaintiff has "limited education" is not. In conjunction with this Court's prior finding in the December 22, 2008 memorandum opinion that Plaintiff's prior work should have been analyzed as "unskilled," Plaintiff's limitations now fall squarely within Grid Rule 201.17, which dictates a finding of disabled. (R. 321-325). As a result, this case will be reversed and remanded with an order to grant benefits consistent with an onset date of July 9, 2004.

### D. Plaintiff's age and additional grid rules

Plaintiff makes an alternative argument surrounding his "borderline" age of forty-nine and a half, the light work exertional category, and the failure of the ALJ to apply other grid rules to his case. (Pl. Brief at 21-26). Since the Appeals Council rendered Plaintiff's two DIB claims "duplicative" and the ALJ does not suggest that Plaintiff went through any period of improvement while waiting out the appeals process and later administrative proceedings, there is nothing to suggest that Plaintiff is only entitled to a closed period of benefits due to an improvement in symptoms. The additional evidence only suggests that his physical and mental difficulties were worsening, not improving. As such, the later-submitted evidence provides absolutely no support for a finding that Plaintiff became capable of more than sedentary work and thus, the issue of borderline age and the application of other grids involving higher exertional levels is unnecessary, thus, Plaintiff was entitled to benefits based on the initial residual functional capacity determination and the opinions of this Court.

## VI. CONCLUSION

Based on the foregoing, Plaintiff's motion for summary judgment (Doc. No. 6) must be granted and the matter will be remanded to the Commissioner solely for the calculation of benefits consistent with an onset date of July 9, 2004. Defendant's motion for summary judgment (Doc. No. 8) is denied.

An appropriate Order follows.

BY THE COURT:

s/Nora Barry Fischer
United States District Judge

cc:     Karl Osterhout, Esquire
Email: karl@keolaw.com

Christy Wiegand, Esquire
Email:christy.weigand@usdoj.gov